J-A19002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES ANTHONY DUBUISSON | : | |
| | : | |
| Appellant | : | No. 965 MDA 2021 |

Appeal from the Judgment of Sentence Entered June 24, 2021
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0000297-2020

BEFORE: BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED OCTOBER 19, 2022**

James Anthony Dubuisson appeals from the aggregate judgment of sentence of 101 to 204 years of imprisonment imposed after a jury convicted him of rape, burglary, strangulation, unlawful restraint of a minor, false imprisonment of a minor, terroristic threats, possession of instruments of crime ("PIC"), simple assault, and tampering with physical evidence. We affirm.

The trial court summarized the facts as follows:

> On the morning of July 21, 2019, Chad Renshaw (hereinafter, "Mr. Renshaw") was walking his dog when he heard someone come up behind him asking for help. N.T. Jury Trial, 6/21/21, at 29-33. He turned around to see a female, the victim in this case (hereinafter, "L.D."), walking towards him frantically. L.D. was topless, clutching her cellular phone, and was repeatedly

---

[*] Former Justice specially assigned to the Superior Court.

asking for help. Mr. Renshaw observed that L.D.'s pants were ripped, her hair was wet, and she was barefoot. When Mr. Renshaw approached her and asked her what happened, she stated she had been raped. Mr. Renshaw did not have a cellular phone on his person that day, so he took L.D. to his home where he offered her clothing. L.D. told Mr. Renshaw that she was sleeping at a friend's home when she woke up to see someone standing in the doorway. She told Mr. Renshaw that the person got on top of her with a knife and raped her. She was then placed in the shower and told to stay there. The police arrived at Mr. Renshaw's home along with L.D.'s father.

Corporal George Sumbury (hereinafter, "Corporal Sumbury") was the first to arrive at Mr. Renshaw's home. Corporal Sumbury completed a minimal facts interview with L.D. L.D stated to him that she was sleeping at her friend's home alone when she woke up to a guy on top of her. She stated that this man held a knife to her throat and raped her. Corporal Sumbury observed cuts and blood on L.D.'s hands. L.D. was then taken to an osteopathic hospital to meet with a SAFE nurse to do a forensic investigation and medical exam. Corporal Sumbury attempted to make contact with the homeowner of the home where the incident occurred.

Joseph Sasa (hereinafter, "Mr. Sasa") testified that he owned the home in which this incident took place. His daughter invited L.D. to the home for a sleepover on July 20, 2019 Mr. Sasa met the Appellant in 2000. He testified they had a sporadic friendship. Their friendship started back up again in 2019. They spoke about Appellant possibly moving into the home. Mr. Sasa gave a tour of the home to the Appellant. Appellant was supposed to begin moving into the home the week following this incident. At the time of the incident, Appellant had not received keys to the home. Mr. Sasa testified that he often does not lock his doors. He further testified that he would permit his friends to enter his home if they called him first and he was on his way to his home.

L.D. testified that she arrived at her friend's home on July 20, 2019, at approximately 10:00 o'clock p.m. In the early hours of July 21, 2019, L.D. testified that she was sleeping in her friend's room alone. L.D. woke up when a person opened the bedroom door. She saw a tall figure in the doorway. The figure then jumped on top of her with a knife. The figure repeatedly asked where L.D.'s friend was. He then flipped her over and tore off her

clothes. The figure put both hands around her neck and affected her ability to breathe. He proceeded to unbuckle his belt, put the knife back to her throat, and rape L.D. L.D. injured her hand by placing it on the knife blade. Appellant then covered her eyes and took her into the shower. L.D. was physically washed by the Appellant and then left alone in the shower. L.D. then ran out of the home and found Mr. Renshaw walking his dog.

Rachael Eilerman, a forensic DNA analyst in the Pennsylvania State Police Forensic DNA Division, testified regarding the DNA analysis in this case. The DNA sample obtained from L.D.'s sexual assault kit returned a match to [Appellant]. [During the ensuing investigation, Appellant gave police a false name and failed to disclose that he had been at the residence the day before the assault.]

Trial Court Opinion, 10/25/21, at 2-4 (cleaned up) (citations to the record omitted).

Prior to trial, the Commonwealth filed a motion *in limine* seeking to exclude the admission of any testimony or evidence of an alleged prior sexual assault at the Sasa residence that occurred one week prior to Appellant's assault of L.D. Charges relating to the prior assault were never filed. Neither the alleged perpetrators nor the victim of the prior assault was connected to Appellant's assault of L.D. Nevertheless, Appellant sought to introduce this evidence to explain bloodstains in several photographs of the crime scene. Additionally, Appellant wished to introduce the evidence to explain Appellant's actions when he first encountered law enforcement. Specifically, Appellant asserted that his knowledge of the prior assault caused him to provide authorities a fictitious name and deny sexual contact with anyone at the residence. On the morning of trial, the court made a preliminary ruling that

granted the motion *in limine,* in part, and deferred its final determination until Appellant sought to introduce the evidence during his case-in-chief.

At the conclusion of the Commonwealth's case, Appellant moved for judgment of acquittal on the counts of involuntary deviate sexual intercourse ("IDSI") and burglary. The trial court granted the motion as to IDSI but denied the motion as to burglary. Thereafter, the defense rested without presenting any evidence beyond a stipulation confirming the authenticity of police photographs of the crime scene.

The jury convicted Appellant of the above-referenced offenses, and the trial court immediately imposed the noted judgment of sentence. The court imposed consecutive mandatory minimum sentences[1] for rape, burglary, strangulation, unlawful restraint of a minor, and false imprisonment of a minor. In addition, the court imposed two consecutive terms of two to five years of imprisonment for terroristic threats and PIC, and two terms of one to two years for simple assault and tampering with physical evidence.

---

[1] Appellant was sentenced to mandatory minimums on several offenses due to his prior conviction of a crime of violence and prior conviction of a sexual offense. **See** 42 Pa.C.S. § 9714(a)(1) (providing that a defendant who has previously been convicted of a crime of violence and is subsequently convicted of a crime of violence shall be sentenced to a mandatory minimum period of incarceration of ten years); 42 Pa.C.S. § 9718.2(a)(1) (providing that a defendant who has previously been convicted of a sexual offense and is subsequently convicted of another sexual offense shall be sentenced to a mandatory minimum period of incarceration of 25 years).

Appellant did not file a post-sentence motion. Instead, he timely filed a notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925. Appellant raises two issues:

I.   Did the lower court err in granting the Commonwealth's Motion i*n Limine* to Exclude Evidence of a Prior Police Incident at the Location of the Instant Offense, where such evidence was relevant and would not have confused the jury?

II.  Did the lower court err when it did not dismiss the Burglary charge for insufficient evidence of an essential element, specifically, that [Appellant] was not licensed or privileged to enter the residence, and where the trial testimony strongly suggested, if not verified, that [Appellant] had standing permission to enter?

Appellant's brief at 4.

Appellant first challenges the trial court's evidentiary ruling, which precluded the admission of evidence of the prior assault at the Sasa residence. The decision to admit or exclude evidence falls within the discretion of the trial court, and this Court reviews such determinations for an abuse of discretion. *See Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015); An "[a]buse of discretion is not merely an error of judgment, but rather, involves bias, ill will, partiality, prejudice manifest unreasonableness, or misapplication of the law." *Commonwealth v. Wade*, 226 A.3d 1023, 1031 (Pa.Super. 2020). Herein, the trial court found the evidence of the prior assault was inadmissible as it was not relevant, and its introduction would have confused the jury.

"The threshold inquiry with the admission of evidence is whether the evidence is relevant." ***Commonwealth v. Collins***, 888 A.2d 564, 577 (Pa. 2005). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." Pa.R.E. 401; ***see also Collins***, ***supra*** at 577 (explaining that evidence is relevant if it "supports a reasonable inference or presumption regarding the existence of a material fact"). While relevant evidence is generally admissible, a trial court "may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." ***See*** Pa.R.E. 402; Pa.R.E. 403. "An appellant bears the 'heavy burden' to demonstrate the trial court abused its discretion on an evidentiary ruling." ***Commonwealth v. Brown***, 212 A.3d 1076, 1086-87 (Pa.Super. 2019).

As noted, in the matter *sub judice* the trial court found that the evidence of the prior assault at the Sasa residence was not relevant and, if introduced, it would have confused the jury. Appellant argues that the evidence of a prior sexual assault at the Sasa house was relevant to Appellant's intent and explains his subsequent actions. Specifically, Appellant argues that his prior knowledge explains why he was hesitant to tell police he was at the residence earlier in the day, and why he gave a false name. Appellant asserts that this prior knowledge led him to believe that he was being set up by Taylor Hiner,

Mr. Sasa's adult daughter and a friend of L.D. Appellant further argues that the evidence of the prior assault was admissible to explain the presence of blood throughout the basement area of the residence in the crime scene photos admitted at trial.

However, the prior assault at the Sasa residence involved neither Appellant nor L.D. As the trial court aptly noted, "[t]he only similarity is that the incident allegedly occurred in the same house as the incident in this case." Trial Court Opinion, 10/25/21, at 5 (cleaned up). We find Appellant's contention that his knowledge of a prior assault at the Sasa residence led to his lying to the authorities to be specious. Appellant offers no logical explanation why evidence of a prior unrelated sexual assault involving different individuals would cause Appellant to have lied to authorities as to his identity and presence in the house on the day of L.D.'s assault. Thus, Appellant failed to establish that the trial court abused its discretion in excluding evidence of the prior assault as not relevant.

Moreover, even if evidence of the prior assault were relevant to Appellant's state of mind or to explain his deception upon questioning by authorities, the trial court did not abuse its discretion in excluding the evidence pursuant to Pa.R.E.403, which permits the exclusion of relevant evidence when its probative value is outweighed by, *inter alia*, a danger of confusing the issues. **See Commonwealth v. Parker**, 882 A.2d 488, 492 (Pa.Super. 2005); ("[T]he function of the trial court is to balance the alleged prejudicial

effect of the evidence against its probative value, and it is not for an appellate court to usurp that function.").

Appellant argues that evidence of the prior assault would explain the bloodstains in some of the crime scene photos as having been from the prior victim, who purportedly suffered a bloody lip. However, Appellant is not disputing the fact that L.D. was bleeding at some point during the ordeal. **See** Appellant's brief at 40 ("While it appears indisputable that L.D. somehow sustained a cut on her finger, a cut on a person's hand can happen any number of ways, particularly when L.D. was in the dark in the bedroom and the bathroom, both of which were windowless.") (citations omitted). While such speculative evidence could conceivably be relevant, the probative value of that evidence is minimal insofar as it does not tend to prove or disprove that Appellant committed the charged offenses. Rather, as the trial court concluded, evidence concerning the unrelated assault at the Sasa residence would distract the jury and confuse the issues because that episode did not involve either L.D. or Appellant. Since nothing in the certified record supports the contention that the trial court abused its discretion in making such a determination, Appellant failed to establish that the trial court erred in excluding the evidence pursuant to Rule 403.

Appellant's second issue on appeal is that the Commonwealth neglected to present sufficient evidence to sustain the burglary conviction. Specifically,

he asserts that the Commonwealth failed to establish that he was not licensed or privileged to enter the Sasa residence.

Our standard of review for this claim is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above[ ]test, the entire record must be evaluated an all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Reed**, 216 A.3d 1114, 1119 (Pa.Super. 2019) (citations omitted).

Appellant was convicted pursuant to the subsection of the burglary statute that provides that an individual commits burglary if, with the intent to commit a crime therein, he enters a building or occupied structure that was adapted for overnight accommodations when another person is present, and the individual commits, attempts, or threatens to commit a bodily injury to said person. **See** 18 Pa.C.S. § 3502(a)(1)(i). However, it is a defense to burglary if "the actor is licensed or privileged to enter." **See** 18 Pa.C.S. § 3502(b)(3). A person is privileged to enter "if he may naturally be expected

to be on the premises often and in the natural course of his duties or habits. Further, a person who is privileged may still commit burglary if he would not reasonably be expected to be present[.]" *See Commonwealth v. Corbin*, 446 A.2d 308, 311 (Pa.Super. 1982) (cleaned up).

For example, in *Corbin*, a janitor arrived after his normal working hours, entered his office building without force, and removed several electronic devices. This Court determined that the Commonwealth presented sufficient evidence to convict Corbin of burglary because his presence at the office after his normal working hours exceeded his privilege to enter the office building. *Id*. at 311.

Appellant argues that he had an open invitation to enter the Sasa residence, which constitutes a complete defense to the burglary conviction. While Mr. Sasa testified that Appellant was going to move into the residence approximately one week after Appellant assaulted L.D. Appellant was never provided with a key. *See* N.T., 6/21/21, at 246-47. Additionally, Appellant was informed by Mr. Sasa that the front door is never really locked. *Id*. at 247. Mr. Sasa further testified that he did not have any plans for Appellant to be at his house on the morning of the assault. However, Mr. Sasa noted that he probably did give Appellant an open invitation "because that's normally the way I am with most of my friends. The door is open and you're welcome. I don't think I said it in those words, but that's the impression I give off to most of my friends." *Id*. at 252. Additionally, the following exchange occurred on cross examination:

Q: I believe you said that you're a friendly sort of dude that doesn't lock their doors and even if—if somebody doesn't have an express invitation there's an implied invitation that they could come see you.

[Mr. Sasa]: Yeah. Like, you know, throughout the years if I got a phone call, hey, I'm on my way over to your house, I'll be there in a couple minutes, let yourself in, have a beer, I'll be there shortly. I have to that extent, yes. I have a bunch of close friends that I've known since I was a kid or 20 years that I didn't think anything of that. Sure.

*Id*. at 282-83.

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, there was sufficient evidence for the jury to conclude that Appellant was not privileged to enter the Sasa residence at approximately 7:00 a.m. on July 21, 2019. Appellant was not scheduled to move into the residence until the following week, he did not have a key, and while Mr. Sasa had a general open-door policy for friends whom he is expecting, he indicated that this is typically prompted by a telephone call in which Mr. Sasa gives express permission for the friend to enter the house while he is away. *See* N.T., 6/21/21, at 282-83. Mr. Sasa's testimony did not suggest that Appellant was expected and authorized to be there on the date and time at issue.

Moreover, even if the evidence did suggest the inference that Mr. Sasa generally had an open-door policy that applied to Appellant, Appellant's entrance to the residence at 7:00 a.m. on a Sunday morning without providing notice to Mr. Sasa is contrary to Appellant's contention that it was a "reasonable, albeit early, hour." *See* Appellant's brief at 45. Mr. Sasa may have permitted expected friends to enter a few minutes before he arrived

home, but that does not make his residence the equivalent of a public place to which all have access any time of day.  Therefore, we conclude that the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to establish beyond a reasonable doubt that Appellant was not licensed to arrive and enter the Sasa residence unannounced at approximately 7:00 a.m. that morning.[2] *See Corbin*, *supra* at 311 (stating that a privileged person may still commit burglary if not reasonably be expected to be present).

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/19/2022

---

[2] To the extent that Appellant contends that the Commonwealth's evidence permitted, rather than required, the jury to conclude that Appellant had standing permission to enter the Sasa residence, that argument presents a challenge to the weight of the evidence, which is not before us.